# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JOSEPH DANIEL SAMET, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-18-2541 |
| | § | |
| JILL COLEMAN, M.D., *ET AL.*, | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, a state inmate proceeding *in forma pauperis* and *pro se* at the time,[1] filed this section 1983 civil lawsuit against Texas Department of Criminal Justice ("TDCJ") officer Jeania Pegoda and University of Texas Medical Branch ("UTMB") employee Jill Coleman, M.D., in their individual capacities.  Defendants filed a *Martinez* Report, which the Court construed as a motion for summary judgment.  (Docket Entry No. 31.)  Plaintiff filed a timely *pro se* response to the motion for summary judgment.  (Docket Entry No. 44.)  He requests that the Court also consider his written objections to the *Martinez* Report (Docket Entry No. 35) and a letter he sent to the Court on April 27, 2020 (Docket Entry No. 46).

Having considered the motion, the response, the pleadings, the record, and the applicable law, the Court GRANTS the motion for summary judgment and DISMISSES this lawsuit for the reasons shown below.

---

[1]Retained counsel filed a notice of appearance on behalf of plaintiff on October 14, 2020. (Docket Entry No. 48.)  All pleadings in the case were filed prior to counsel's notice of appearance.

### *Background and Claims*

Plaintiff claims that in October 2017, defendant Jill Coleman, a UTMB physician working for TDCJ, informed him that she could not renew medication for his "thyroid condition" without an updated blood draw and lab report.  (Docket Entry No. 9, p. 5.) Plaintiff states that a blood sample was drawn and a lab report was sent to Coleman, but she failed to initiate treatment for his condition.  Copies of select medical records submitted by plaintiff show that Coleman reviewed the lab results on November 15, 2017, ordered the tests rechecked, and scheduled his chart for review in two weeks.  *Id.*, p. 21.  Plaintiff's grievances suggest he failed to keep a scheduled follow-up appointment, but plaintiff states that Coleman failed to provide thyroid medication even after his blood was redrawn and tested at a later appointment.

According to plaintiff, Coleman should have started treating him for hypothyroidism immediately after she reviewed the first lab test results.  In his layperson's opinion, the lab report "clearly showed a need to be treated."  (Docket Entry No. 9, p. 8.)  He complains that Coleman was deliberately indifferent to his serious medical needs because untreated hypothyroidism can be a life-threatening condition.  He also claims that Coleman denied him treatment rights to which he was entitled under the Americans with Disabilities Act ("ADA"),  42 U.S.C. § 12101 *et seq*., because hypothyroidism is a disability.

2

Plaintiff further claims that defendant prison library supervisor Jeania Pegoda denied him entitlements under the ADA by removing his "medical storage box."[2]

Plaintiff seeks declaratory and injunctive relief, and $75,000.00 in monetary compensation.

## *Analysis*

### *Defendant Jill Coleman, M.D.*

Plaintiff claims that defendant Coleman refused to provide him medication to treat his thyroid condition. According to plaintiff, Coleman's conduct constituted deliberate indifference to his serious medical needs, and was a violation of his rights under the ADA.

Defendants provided an affidavit of Glenda M. Adams, M.D., in support of their motion for summary judgment. Dr. Adams testifies in her affidavit in relevant part as follows:

> My name is Glenda M. Adams, M.D., M.P.H. I am over the age of 18 years, competent to make this affidavit and have personal knowledge of the facts herein stated. I earned my Doctor of Medicine in 1976 from the University of Texas Medical Branch in Galveston, Texas. I earned my Masters in Public Health in 1993 from the University of Texas School of Public Health in Houston, Texas. I am licensed as a medical doctor by the Texas Medical Board. I am currently a physician consultant for The University of Texas Medical Branch Correctional Managed Care (UTMB/CMC). In the last four years I have not testified as an expert at trial or in deposition. I have provided 30(b)(6) testimony for UTMB in two depositions within the last four years. I have been with UTMB/CMC since June, 1995.

---

[2]By "medical storage box," plaintiff is referring to a floor-level or low-level storage locker, as opposed to an overhead wall storage unit.

3

I am making this affidavit in connection with Civil Action No. H-18-2541, *Joseph Samet v. Jill Coleman, M.D., et al.*, in the United States District Court for the Southern District of Texas, Houston Division.  To prepare for this affidavit, I have reviewed: 1) the correctional medical records of Joseph Samet, 2) Plaintiff's Complaint signed August 2, 2018, 3) various Texas Department of Criminal Justice (TDCJ) Grievance Records, and 4) the Court's Order for a *Martinez* Report.  I am familiar with UTMB/CMC policies and procedures with respect to the provision of medical care.  I am not receiving any pay, save my usual salary, for review of records or preparation of this affidavit.

## Summary of Complaint and Court Order

[Plaintiff] alleges that defendants have "violated his Eighth Amendment rights and denied him entitlements under the Americans with Disabilities Act (ADA)."  He further alleges that Dr. Jill Coleman has been "deliberately indifferent to his serious medical needs regarding his thyroid condition."  The Court has ordered a report on [plaintiff's] medical care including his medical records from 2013 to the present. The report is [also] to include any records relevant to "the alleged 2017 approval or authorization for plaintiff's use of a medical storage box and the subsequent administrative decision to remove such storage box."

## Medical Record Findings

[Plaintiff] is a 61-year-old male who arrived to TDCJ July 20, 2007.  He is currently housed at the TDCJ Estelle Unit in Huntsville, Texas[.]  His medical problems include obesity, hypertension, COPD (Chronic Obstructive Pulmonary Disease), hyperlipidemia ( elevated cholesterol and triglycerides), osteoarthritis, and subclinical hypothyroidism.  He is hearing impaired and wears a hearing aid.  He also has decreased visual acuity (that corrects with glasses to 20/40 bilaterally) and mild glaucoma.  [His] osteoarthritis (left foot, ankle, and back from prior trauma) causes him discomfort with prolonged standing and/or ambulation.

\*   \*   \*   \*

Since his arrival to TDCJ [plaintiff] has been followed in chronic care clinics at least annually and seen for acute problems upon request.  His care has been made difficult because of his non-adherence to treatment plans.  He is a frequent "no show" and/or refuses appointments – especially appointments for

blood pressure checks and laboratory studies. [Plaintiff's] attitude toward laboratory blood draws is illustrated in a February 19, 2015, chronic care clinic note when he states "I am not coming at 2 am to get any lab." At an October 12, 2017, chronic care clinic [plaintiff] was asked about his failure to have necessary labs drawn in January and August of 2017. He offered the excuse that he cannot hear when he is called for labs. At a November 27, 2018, chronic care clinic [he] offered the same excuse that he cannot hear the morning call for the pill window as his reason for not taking medications. However, [plaintiff] has long been provided a hearing aid and a "shake awake alarm." Prisons operate on schedules. The opening of the morning pill window and fasting laboratory draws coincide with or are in close proximity to the start of breakfast. Also, offenders are sent "lay-in's" or notices the night before scheduled lab draws so the patient can remember to fast and, if necessary, set an alarm.

[Plaintiff] has been provided multiple medical, dental, and mental health evaluations. He has been offered health maintenance screenings and preventive care ( *e.g.* prostate and colon cancer screens, testing for infectious diseases, vaccinations, *etc.*) but consistently refuses most offers and recommendations. He has been referred to various UTMB/CMC specialty clinics (*e.g.* Audiology, Ophthalmology, MRI Radiology, Brace and Limb/Orthotics) but has repeatedly refused many of these evaluations. When questioned, [plaintiff] "reports he refuses to go to Galveston because he does not want to take the bus ride." However, [he] has been offered special medical transportation since December 17, 2013.

Throughout his TDCJ incarceration [plaintiff] has been ordered restrictions and passes as appropriate to meet his medical needs. Since July 22, 2014, [his] HSM-18 (Health Summary for Classification) restrictions have included a lower bunk, ground floor housing, medically unassigned (no work), no walking greater than 50 yards, no lifting greater than 10 pounds, no exposure to environmental pollutants, and no work with chemicals or irritants. He has been issued medical passes to meet medical needs not covered by the HSM-18. These have included but are not limited to passes for 1) a hearing aid/case/cleaning supplies and batteries, 2) crutches and/or an orthopedic cane, 3) ace wraps, ankle braces or splints, 4) tennis shoes or special medical shoes and socks, 4) "disability chow" (food tray is brought to offender's table), 5) "disability shower" (handicap shower stall and longer time to shower), 6) a special diet for health, and 7) passes to come to the medical clinic to receive treatments, supplies, and/or medications. Also, [plaintiff] is followed by Brace

and Limb Clinic and ADS (Assistive Disability Services) and has been provided passes for orthotics/shoe inserts and a "shake awake alarm."

On September 16, 2016, [plaintiff] was sent a communication from his medical provider that laboratory studies had been ordered for him in preparation for a chronic care clinic. On September 21 he refused the lab studies. On November 22, 2016, he refused his chronic care clinic and was rescheduled. On November 28, 2016, he again refused his chronic care clinic so he was rescheduled once again. On January 3, 2017, [he] was seen in chronic care clinic and the importance of having current lab results was stressed to him. His response was that his labs "were suppose to be dawn by a Ms. Dobbins but never drawn." Laboratory studies were reordered. All of [plaintiff's] prescriptions except thyroid medication were ordered. On January 6, 2017, [plaintiff] again refused his lab draw.

[Plaintiff] was transferred from the Pack Unit in Navasota, Texas to the Estelle Unit in Huntsville, Texas on January 25, 2017. On February 3, 2017, [he] was re-ordered special medical transportation (MPV or multi-patient vehicle) and a handicap shower pass. He was also referred to Estelle Brace and Limb Clinic for replacement medical shoes and to Hospital Galveston (HG) Audiology for evaluation and possible new hearing aid. On April 25, 2017, [plaintiff] refused his Audiology appointment. On May 31, 2017, [he] was seen by Estelle Optometry, prescribed new eyeglasses, and referred to HG Ophthalmology for re-evaluation of glaucoma. However, as previously noted, [plaintiff] refuses to travel to Galveston for appointments.

[Plaintiff] was scheduled for chronic care clinic and an annual physical exam on August 19, 2017, but failed to keep his appointment. The provider ordered laboratory testing and that the appointment be rescheduled. However, once again on August 25, 2017, [plaintiff] refused to report to the clinic for his labs to be drawn. He also failed to show for his rescheduled chronic care clinic/annual physical exam appointment on September 7, 2017. Despite [plaintiff's] "no show" Dr. Jill Coleman reviewed [plaintiff's] medical record on September 8, 2017, and refilled his glaucoma eye drops (tirnolol 0.5%).

The medical record indicates that, to date, [plaintiff] has had a single telemedicine encounter with Dr. Jill Coleman on October 12, 2017. At this chronic care clinic visit [plaintiff] informed Dr. Coleman that he had not taken his KOP (keep on person) blood pressure medication since January and did not know his glaucoma eye drops were available at the pill window. Review of

his medication compliance showed [plaintiff] had not picked up his albuterol (Proventil) inhaler in five months and compliance with theophylline, a non-KOP medication, was only 3.7%.  His hypothyroidism had not been treated since December 2016.  Dr. Coleman's assessment was –

    1)    HTN [hypertension] - BP [blood pressure] elevated. No meds taken in over 6 months, though appear to be ordered

    2)    COPD (chronic obstructive pulmonary disease) – treated with NF (non-formulary) Theophylline, QVAR, and Proventil.  Has not used any Proventil in several months, as has not picked up meds.  States he only takes Theophylline when it is hot outside

    3)    Hypothyroidism – Not on thyroid replacement.  Last treated consistently was 2015.  Had one month of renewal since.  Pt is noncompliant with lab draws, attending clinic appointments.  No labs available to evaluate

    4)    HLD (hyperlipidemia) – Not treated.  No labs available to evaluate

    5)    Obese

    6)    Glaucoma – Pt refuses HG OPHTH (Hospital Galveston Ophthalmology)

    7)    Walks on crutches, h/o (history of) L heel fracture and resultant deformity noted on Intake physical 7/16 – Indefinite crutch pass ordered at that time

Dr. Coleman's treatment plan was –

    1)    Refill antihypertensives as ordered

    2)    COPD (reports inhaling HCL (hydrochloric acid) – COPD vs restrictive lung dz (disease)) – Refill meds,

will wait on Theophylline refill for now – only takes < 4 % of time, and has almost 3 months left on Rx

3)   Pt urged to keep lab draw appt

4)   F/U in 2 weeks – to review labs, assess for need for treatment of hypothyroidism and hyperlipidemia

5)   CCA (correctional clinical associate) Milum is writing to lab to try to have this pt taken for labs later in the morning because he says he cannot hear when they call him from sleep early in the morning

6)   Refill Latanoprost.  Informed pt that Timolol has been ordered

7)   Increase exercise as tolerated and decrease weight

8)   Renew crutch pass[.]

[Plaintiff's] laboratory studies were drawn on October 18, 2017, but for unknown reasons the ordered two week follow-up did not happen. Dr. Coleman reviewed [plaintiff's] lab results on November 15, 2017. Because his potassium (K) and thyroid stimulating hormone (TSH) were elevated (but his T3 and T4 were normal), Dr. Coleman ordered repeat potassium and thyroid function tests (TFTs).  However, [plaintiff] was a "no show" four times for the repeat lab studies.  After reviewing [plaintiff's] medical record on February 22, 2018, Dr. Coleman noted the absence of the ordered repeat lab studies and that [plaintiff's]  prescription for glaucoma eye drops would soon be expiring.  She renewed [his] prescription for timolol 0.5% and ordered laboratory testing for May 23, 2018, just prior to [plaintiff's] scheduled annual physical exam.  This was Dr. Coleman's last medical record entry for [plaintiff].

[Plaintiff] continues to miss various medical and laboratory appointments but was seen in chronic care clinic by Dr. Ramon Saucedo on September 27, 2018. At this visit [plaintiff] shared that he never takes his blood pressure medications (even though these were KOP medications) and routinely eats ramen noodles because he does not want to walk to the chow hall.  [Plaintiff] was without symptoms of hypothyroidism and his thyroid function tests were essentially unchanged with an elevated TSH but normal T3 and T4 levels.

However, Dr. Saucedo decided to order [plaintiff] a trial of low dose levothyroxine.  He also started [him] on anti-cholesterol medication and reordered all his chronic care medications but made them DOT (Directly Observed Therapy).  Directly Observed Therapy is utilized to monitor and assess patient compliance to better determine appropriate dosages of critical medications. The intent is to reduce adverse effects and achieve better outcomes.  Dr. Saucedo also ordered weekly blood pressure checks for a month due to [plaintiff's] elevated systolic blood pressure.  However, [plaintiff] never showed for any of his serial blood pressure appointments even when they were reordered by Dr. Saucedo on November 27, 2018, and January 8, 2019.  [Plaintiff] also refused to participate with DOT medication administration despite counseling by nursing on November 29, 2018.  Because [plaintiff] did not take any prescribed medications for several months, on April 22, 2019, Dr. Saucedo ordered [plaintiff's] medications to again be KOP.  Dr. Saucedo also reordered serial blood pressures – but [plaintiff] still "no showed" for each and every blood pressure check appointment.  The same occurred when Dr. Saucedo once again reordered blood pressure checks on June 13, 2019.  To date [plaintiff] has not cooperated with any serial blood pressure checks.

UTMB/CMC Defendants

[Plaintiff] has named the following UTMB/CMC Defendants in this litigation and alleges that each exhibited "deliberate difference" to his serious medical need related to his thyroid condition.

1)      Jill Coleman, M.D. (UTMB/CMC Telehealth Physician) – Dr. Coleman provides telehealth (video) physician services to offender patients at facilities where UTMB/CMC is under contract to deliver healthcare.  To maintain access to care at the TDCJ Estelle Unit Dr.  Coleman's services are sometimes utilized to supplement on-site staffing.  She is not a regular Estelle Unit healthcare provider; hence, her limited number of interactions with [plaintiff].

Dr. Coleman's care of [plaintiff] was appropriate and meets medical standards of care. *[Plaintiff] has "subclinical" hypothyroidism (elevated TSH with normal T3 and T4) and is asymptomatic for hypothyroidism – i.e.* he has not offered any complaints of common hypothyroid symptoms (*e.g.* fatigue, cold sensitivity, dry skin, brittle nails, constipation, sore muscles, etc.).  *Since his TSH is less than 10 mIU/L (mill-international units per liter), he is considered to be at low risk for developing overt hypothyroidism.*  Considering the

9

possible toxic effects and the need to titrate thyroid medication along with [plaintiff's] non-adherence to treatment plans, *Dr. Coleman's decision to clarify and monitor his thyroid status rather than immediately start thyroid medication (levothyroxine) was entirely appropriate.*

(Docket Entry No. 31-13, Affidavit of Glenda M. Adams, M.D., M.P.H., footnotes and record citations omitted, emphasis added.)

In his objections to the *Martinez* Report (Docket Entry No. 35), plaintiff asserts that Dr. Adams did not have "personal knowledge" of the facts appearing in the medical records, and that her affidavit contained false evidence and statements. In her affidavit, Dr. Adams stated that her affidavit was based upon her review of plaintiff's medical records, his complaint and grievance records, and the Court's order for a *Martinez* report. Dr. Adams further stated that she was familiar with UTMB/CMC policies and procedures with respect to the provision of medical care. Moreover, plaintiff's assertions of false evidence and statements are based upon his disagreement with statements made by Dr. Adams in her affidavit, or by explanations and information provided by plaintiff not otherwise appearing in the records reviewed by Dr. Adams. Plaintiff has explained his disagreements with Dr. Adams's affidavit testimony, and his objections are OVERRULED.

### Deliberate indifference claim against Coleman

Plaintiff claims that Coleman was deliberately indifferent to his serious medical needs by not treating his hypothyroidism with thyroid medication. "A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when his conduct

demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an unnecessary and wanton infliction of pain." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

The Eighth Amendment deliberate indifference standard has both an objective and subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To establish deliberate indifference under this standard, a prisoner must show that (1) the defendants were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn, and (2) that they actually drew an inference that such potential for harm existed. *See id.* at 837; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).

The Fifth Circuit has stated that the deliberate indifference standard is an "extremely high" one to meet. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). A prison official acts with deliberate indifference only if he knows the inmate faces a substantial risk of serious bodily harm and he disregards that risk by failing to take reasonable measures to abate it. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference. Nor does a prisoner's disagreement with his medical treatment constitute indifference absent exceptional circumstances." *Id.* (citations omitted). A showing of deliberate indifference requires the prisoner to submit evidence that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* (citations omitted).

11

In his response to the motion for summary judgment (Docket Entry No. 44), plaintiff re-asserts his opinions as a layperson that he had life-threatening hypothyroidism that needed immediate medical treatment with levothyroxine. In support, he points out that physicians who evaluated him at other prison units before and after Coleman gave him thyroid medication. However, as attested by Dr. Adams in her affidavit, plaintiff's medical records indicated no signs or symptoms of overt hypothyroidism requiring immediate treatment with medication. As testified by Dr. Adams, plaintiff's medical records showed that he had "subclinical hypothyroidism (elevated TSH with normal T3 and T4) and [was] asymptomatic for hypothyroidism[.]" Dr. Adams further testified that, "Since his TSH is less than 10 mIU/L (mill-international units per liter), he is considered to be at low risk for developing overt hypothyroidism. . . . Dr. Coleman's decision to clarify and monitor his thyroid status rather than immediately start thyroid medication (levothyroxine) was entirely appropriate." Plaintiff presents no probative summary judgment evidence contesting these statements, and his conclusory allegations and personal opinions are insufficient to preclude the granting of Coleman's motion for summary judgment as to deliberate indifference.

Plaintiff's medical records demonstrate that his health conditions, including his "thyroid condition," were evaluated and treated as deemed medically necessary. Defendant Coleman evaluated plaintiff and, in the exercise of her professional judgment, determined that clarifying and monitoring his condition was necessary in lieu of commencing treatment

at that time.  Plaintiff's disagreement with Coleman's medical judgment does not support a claim for deliberate indifference under the Eighth Amendment.

Plaintiff's conclusory allegations of deliberate indifference are insufficient to demonstrate an Eighth Amendment claim, and Coleman is entitled to summary judgment dismissal of plaintiff's deliberate indifference claim against her.

### ADA claim against Coleman

Plaintiff claims that Coleman's decision not to prescribe levothyroxine violated his rights under the ADA.  The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  In order to prevail on a claim under Title II of the ADA, a plaintiff must show: "(1) that he has a qualifying disability; (2) that he is being denied the benefits, services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability."  *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).  The ADA places an "affirmative obligation" on the state "to make reasonable accommodations" for persons with disabilities in the provision of public services. *Smith v. Harris County*, 956 F.3d 311, 317 (5th Cir. 2020). Intentional discrimination is required in order to recover compensatory damages under the ADA.  *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002).

The ADA protects people incarcerated in state prisons. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998); *Hale v. King*, 642 F.3d 492 (5th Cir. 2011). In the prison context, failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners. *See United States v. Georgia*, 546 U.S. 151, 160 (2006) (recognizing prisoner's allegations that defendant refused to provide a reasonable accommodation to a paraplegic inmate, "in such fundamentals as mobility, hygiene, medical care," resulted in the disabled prisoner suffering serious punishment "without penal justification" and supported a claim under the ADA). Nevertheless, the ADA is not violated by "a prison's simply failing to attend to the medical needs of its disabled prisoners." *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir. 2012).

However, the ADA is a discrimination statute. The fact that a person has, or may have, a qualifying disability is not alone sufficient to state a cognizable ADA claim. Rather, the person with a disability must also establish causation, *i.e.*, that he was discriminated against in the provision of benefits, services or programs by reason of his disability. Plaintiff proffers no probative summary judgment evidence establishing that Coleman denied him treatment for a thyroid condition *by reason of* any disability plaintiff had or claimed to have. The record and probative summary judgment evidence show that Coleman examined plaintiff and determined that thyroid medications were not medically warranted at that time. Indeed,

as shown in Dr. Adams's affidavit, plaintiff's diagnostic testing evinced a subclinical case of hypothyroidism that was non-symptomatic and did not warrant medication. That other medical care providers may have reached a different medical judgment at earlier or later points in plaintiff's prison medical care does not constitute proof that Coleman discriminated against him by reason of any disability under the ADA.

Plaintiff's claims and factual allegations against Coleman demonstrate his disagreement with Coleman's medical judgment and decisions. His disagreement does not give rise to an ADA claim for discrimination. Plaintiff's conclusory allegations of discrimination are insufficient to demonstrate an ADA violation, and Coleman is entitled to summary judgment dismissal of plaintiff's ADA claim against her.

*Defendant Jeania Pegoda*

Plaintiff claims that defendant Pegoda denied him entitlements under the ADA. Specifically, he contends that, by removing the "medical storage box" in his cell, Pegoda discriminated against him as a disabled prisoner and violated the ADA.

In her affidavit in support of defendants' motion for summary judgment, Dr. Adams testifies in relevant part as follows:

Medical Storage Box

In his Complaint [plaintiff] states that Warden Carter approved for him to have an ADS [accessability and disability service] storage box in 2017. In TDCJ Grievance #20181215146 [plaintiff] says he was provided a "medical storage box" in August 2017 but that it was removed in February 2018. UTMB/CMC cannot confirm if, when, or why [plaintiff] was issued a special storage box. There is no information on this in the medical record. Of note is that despite

15

medical providers having ordered many medical passes for [plaintiff] since his entry into TDCJ in 2007, there is no documentation in the medical record of any healthcare provider having ordered or recommended that [he] receive a pass for a "medical" storage box.   Also, there is no medical record documentation of [his] requesting a "medical" storage box prior to March 6, 2018 when he questioned his ADS caseworker.   The case worker advised that the Practice Manager approved medical locker boxes and she would check with him [Mr. Mott] about the criteria to have one.   On April 25, 2018 [plaintiff] submitted a Sick Call Request demanding a "medical locker box" and threatening legal action if his demand was not met. The final mention of a medical storage box in the medical record is in a June 11, 2019, ADS clinic note (a late entry for a June l0, 2019 encounter).   The ADS caseworker documented "Patient states he filed a lawsuit about the medical box that was taken from him."

[Plaintiff] arrived to TDCJ July 20, 2007.   Despite his non-adherence to treatment plans, his medical condition now is much the same as it was in 2007. If, as he reports, he did not receive a medical storage box until August 2017, this would suggest he was incarcerated about ten years without such a storage box.   In general, a TDCJ offender patient is medically approved for a ground level storage box for short stature (height of five feet or less) or if the offender has the HSM-18 restriction of "no reaching over shoulder."   Otherwise, decisions about "medical" storage boxes are made on a case-by-case basis.

[Plaintiff] is several inches taller than five feet and does not require the HSM-18 restriction of "no reaching over shoulder."   His hearing deficit does not impact the type of storage box he needs.   His visual acuity corrects with glasses.   His mobility issue is due to an old left foot and ankle injury with calcaneal (heel) deformity and "mild laxity in the LT ankle" for which he has been supplied special orthotic shoes with left ankle bracing.   He ambulates with the assistance of crutches or a cane due to discomfort when walking.   His weight bearing is abnormal when walking (walks on the lateral side of his foot) but he is able to stand and bear weight on both feet.   During his twelve years in TDCJ, to date, no medical provider has determined that [plaintiff] requires the special accommodation of a "medical" storage box.

While the medical record does not address the decision to remove [plaintiff's] ground level storage box, responses to [his] grievances indicate that Practice Manager Khari Mott was consulted about [plaintiff's] need for a subsequent storage container –

> Step 1 has addressed your complaint. Medical subsequent storage containers are issued in accordance with ATC-040. According to Mr. Mott, Unit Practice Manager, your physical limitations / medical supplies do not necessitate the issuance of a subsequent storage container. No further action is warranted." (dated March 29, 2018)

In a telephone conversation with Mr. Mott on July 3, 2019, he confirmed that security contacted him in 2017 and based upon his review of [plaintiff's] medical record at the time, he provided –

> Offenders with certain medical restrictions <u>may</u> qualify for a subsequent storage container. The Unit Practice Manager or Doctor shall certify the offender's limitations / medical supplies that necessitate the issuance of subsequent storage the following information: Offender's physical limitation(s)/medical supplies <u>do not</u> necessitate the issuance of a subsequent storage container. (dated 12/20/17)

To date, there is no medical record documentation that [plaintiff] has ever raised the issue of a medical storage box with a physician or midlevel provider (physician assistant or nurse practitioner). However, Mr. Mott visited [plaintiff's] housing area on July 3, 2019, and reports that all the cabinetry and lockers are now at ground level. There is no above bunk storage in [plaintiff's] housing area at the Estelle Unit. When and how [he] regained ground level storage is unknown to Mr. Mott and UTMB/CMC.

(Docket Entry No. 31-14, Affidavit of Glenda M. Adams, M.D., M.P.H., footnotes and record citations omitted.)

As discussed above, a successful ADA claim requires a plaintiff to establish "(1) that he has a qualifying disability; (2) that he is being denied the benefits, services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale*, 642 F.3d at 499. The fact that a person has a qualifying disability is not alone sufficient to state

17

a cognizable ADA claim. Rather, the person with a disability must also establish causation, *i.e.*, that he was discriminated against in the provision of benefits, services or programs by reason of his disability. The ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners." *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).

Plaintiff asks that the Court consider the letter he filed on April 27, 2020 (Docket Entry No. 46). The Court has reviewed the letter, and notes that plaintiff directs the Court's attention to a settlement in *Wilson v. TDCJ*, C.A. No. H-14-1188 (S.D. Tex.). In the relevant portion of the settlement agreement, as read into the record during a court hearing held May 22, 2017, Estelle Unit prison officials agreed that, "[o]ffenders at Estelle with confirmed visual disabilities will be provided supplemental storage boxes upon request to the TDCJ law librarian and with permission, from the warden. Visually impaired offenders do not need to request supplemental storage boxes from the medical department." Plaintiff claims that his "mild glaucoma" is a visual impairment and disability that entitled him to the supplemental "medical" storage box.

Although plaintiff's medical records indicate that he had mild glaucoma which was being treated with medical eye drops, the records do not indicate that the condition was causing him any visual impairment. To the contrary, the only visual impairment appearing in plaintiff's records was his need for corrective lenses; his glasses corrected his vision to 20/40. No "confirmed visual disability" appears in his records.

Indeed, in his response to the motion for summary judgment (Docket Entry No. 44), plaintiff states that his foot deformity and need for crutches entitled him to floor-level storage. However, plaintiff presents no probative summary judgment evidence establishing that he was denied floor-level storage *because of* his foot deformity or an ambulation disability.

Plaintiff proffers no probative summary judgment evidence supporting his claim that Pegoda violated his rights under the ADA. His conclusory allegations of discrimination are insufficient to preclude the granting of Pegoda's motion for summary judgment.

*Permanent Injunctive Relief*

Plaintiff's claims against the defendants have been summarily dismissed, and no basis for permanent injunctive relief is shown. Regardless, it appears from the record and probative summary judgment evidence that plaintiff has been provided floor-level storage and hypothyroidism medication at the Estelle Unit, and his requests for injunctive relief as to those issues has become moot. *See Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008).

### *Conclusion*

The motion for summary judgment (Docket Entry No. 31) is GRANTED and this lawsuit is DISMISSED WITH PREJUDICE.  Any and all pending motions are DISMISSED AS MOOT.

Signed at Houston, Texas on March 19, 2021.

Gray H. Miller
Senior United States District Judge

20